CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

March 14, 2025

LAURA A. AUSTIN, CLERK
BY  s/ S. MELVIN
          DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| THOMAS S., | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:23cv00065 |
| v. | ) | |
| | ) | REPORT & RECOMMENDATION |
| LEE DUDEK, | ) | |
| Acting Commissioner of Social Security, | ) | By:   Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Thomas S. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decision denying his claim for disability insurance benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 404–434. Compl., ECF No. 1.

The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the

administrative record ("R."), ECF No. 6; the parties' briefs, ECF Nos. 11, 15; and the applicable

law, I find substantial evidence does not support the Commissioner's final decision that Thomas

was not disabled during the relevant time. R. 1, 17–32. Accordingly, I respectfully recommend

that the presiding District Judge reverse the decision and remand Thomas's DIB claim for

rehearing under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it cannot

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" under the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work available in the economy. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th

Cir. 2017); 20 C.F.R. § 404.1520(a)(4).[1] The claimant bears the burden of proof through step

four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the

claimant is not disabled. *See id.*

## II. Background

Thomas medically retired from the United States Army in September 2016. R. 866–69,

1855–57. Beginning in the spring of 2016, he underwent various disability-benefits consultations

and examinations at the Veterans Affairs Medical Center ("VAMC") in Salem, Virginia. *See* R.

871–960. Thomas claimed service-connected medical conditions including frequent and severe

migraine headaches, R. 956–59; traumatic brain injury ("TBI") with subjective cognitive deficits

that "mildly interfere[d]" with his day-to-day functioning, R. 951–56; post-traumatic stress

disorder ("PTSD") with persistent anxiety and depression, R. 946–50; and "mild, intermittent"

neck and back pain with radiculopathy status-post cervical and lumbar spinal fusions, R. 878–83,

907–13, 927–28, 930. In March, he told an examining physician that his migraines caused

"strong sharp pain or pulsating type pain," nausea, and sensitivity to light and sound. R. 957.

Each headache lasted "about 3 to 4 hours, on an average [of] 20 times a month." *Id.* "[I]n the past

12 months" before he retired from active-duty military service, Thomas "left 3–4 hours early

from work on an average of 3 to 4 days a week" because of his migraines. R. 959. In December

2016, D.J. Thaler, M.D., a primary-care physician at the Salem VAMC, "reevaluated" Thomas's

"service connected [headache] condition" for the VA's disability rating board. *See* R. 845–47.

Thomas reported that his "migraines remain[ed] the same" since his initial evaluation. R. 846.

Dr. Thaler opined that Thomas "ha[d] been limited to 3–4 hours a day of work due to developing

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the Commissioner's final decision.

headaches as well as requiring frequent sick days due to recurrent migraine." R. 847. The VA

subsequently awarded Thomas disability retirement benefits based on a 100% service-connected

disability rating. *See* R. 621, 869, 1062, 1614. Thomas's diagnosed "traumatic brain disease,"

migraine headaches, "intervertebral disc syndrome," "paralysis of middle radicular nerves," and

"paralysis of sciatic nerve" are all service-connected medical conditions. R. 1614.

In January 2021, Thomas filed for DIB alleging he had been disabled since September

30, 2016, because of PTSD with agoraphobia, TBI, migraines, cervical and lumbar degenerative

disc disease status-post fusion surgeries, intervertebral disc syndrome, radiculopathy in all four

extremities, and sciatic nerve paralysis. *See* R. 191–92, 208. Virginia Disability Determination

Services ("DDS") denied his claim initially in May 2021, R. 75–87, and upon reconsideration in

December 2021, R. 88–100. The DDS reviewers determined he had four kinds of medically

determinable impairments ("MDIs"): traumatic brain injury; disorders of the skeletal spine

resulting in compromise of a nerve root; anxiety disorders; and trauma- or stressor-related

disorders. *See* R. 81–82, 93–94. They did not identify migraines as an independent MDI. *Id.*

The DDS reviewing physicians opined that Thomas's cervical/lumbar spinal fusions and

residual symptoms limited him to lifting, carrying, pushing, or pulling ten pounds frequently and

twenty pounds occasionally; sitting and standing/walking for "[a]bout 6 hours [each] in an 8 hour

workday"; and occasionally climbing ramps/stairs, stooping, and crawling, but never climbing

ladders/ropes/scaffolds. R. 83–84, 95–96. He should "avoid concentrated exposure" to extreme

cold and respiratory irritants and "avoid even moderate exposure" to workplace hazards. R. 84,

96 (capitalization altered). The DDS psychologists opined that their "[r]eview of the medical

evidence" revealed that Thomas "retains the ability to concentrate on 1–2 step tasks, frequently

complete assignments on time and at a normal pace, interact with others on an individual basis[,]

4

and make simple decisions." R. 86, 98 ("The claimant can understand, retain, and follow simple

job instructions, specifically performing one and two step tasks. The claimant is able to maintain

concentration and attention for at least 2 hour segments before needing a regularly scheduled

break. The claimant is able to maintain socially appropriate behavior. . . . The claimant can

frequently make simple decisions."). He could "interact appropriately with the general public."

*Id.* However, he "would frequently have issues interacting with more than 3 people at a time." *Id.*

The DDS psychologists explained that they based their opinions on Thomas's "reports [that] his

wife has to remind him to take his medications" and "he has trouble handling stress," as well as

"current exams where he reports increased nightmares," R. 86, 98, but where his "memory and

cognition" were "intact," R. 85, 87. *See* R. 30 (citing R. 85–86, 97–98).

      In March 2023, Thomas appeared with counsel and testified by telephone at a hearing

before ALJ L. Raquel BaileySmith. R. 40–60. Thomas alleged that he was disabled by constant

neck/back pain; frequent and severe migraine headaches; trouble paying attention, remembering

things, and staying on task; anxiety, panic attacks, and irritability; and social avoidance. *See* R.

46–59; *accord* R. 237–43, 253 (Feb. 2021). He had lumbar fusion surgery in 2014 and cervical

fusion surgery in 2015. R. 46; *see also* R. 301–04, 307–09, 214–16, 329–30, 453–56, 878.

Thomas still "periodically" underwent "spinal taps and injections [or] epidurals" in his neck and

lower back. R. 46; *accord* R. 413–17, 425–26, 428, 435–37, 453–56, 466–70, 476–80. He also

had "[t]o have nerves burnt and steroids injected to help ease the pain." R. 46; *accord* R. 407–11,

462–70, 1623–24. The spinal fusions and various post-operative procedures helped, but he was

still in pain every day. R. 47; *see also* R. 407–09, 425–26, 435–37, 453–56, 462–70, 476–80,

499–502, 810, 1623–24. Thomas estimated that he can stand for about ten minutes, sit in one

position for about 15 minutes, and walk for about 20 minutes before stopping to rest. R. 49–50;
*see also* R. 237, 453–56 (Feb. 2021).

Thomas takes four different medications to manage his migraines. R. 52; *accord* R. 1894.
He has migraines "at least once a week," but he "could have spells of them where [he'll] get two
or three in a week." R. 52; *accord* R. 237–38, 244, 613–15, 657, 676, 706–07, 710–11, 808, 845–
47, 1480–82, 1686–87, 1724–50, 1826. Light, loud noises, heat, changes in weather, and anxiety
can all trigger a debilitating migraine. R. 53; *accord* R. 710, 768. "Sometimes it comes on with
no warning whatsoever." R. 53. A migraine "feels like [his] brain is being crushed and [his] head
is exploding." *Id.* This feeling usually lasts "[s]ix or eight hours," but "[i]t can be shortened by
the medication." R. 54. When it works, this medication puts him to sleep within 30 minutes. R.
54–55. Thomas is "exhausted" for the rest of the day after a migraine. *Id.* He also gets "real
anxious when [he's] around any kind of crowd." R. 55; *accord* R. 241, 583–84, 659, 1251, 1358,
1681–82. He limits social interactions. R. 57; *accord* R. 241, 246, 250, 1243, 1251, 1826, 1969,
1971. "Unless [he's] accompanied by family members," Thomas does not leave home "except . .
. to go to the grocery store or to pick [his] daughter up or drop her off, that sort of thing." R. 57;
*see also* R. 238, 240–41, 249–50, 535, 551, 583, 657, 841, 844, 657, 1235–36, 1969–72.

Thomas used to suffer from "debilitating migraines" with light sensitivity and vertigo "at
least 2x a week." *See* R. 237–38, 244 (Feb. 2021). He "can't get out of bed" at all on those days.
R. 237–38. On a typical day, Thomas will "try to go out and feed the animals in the morning"
and then "try [to] work on an art project" or clean around the house. R. 50 (Mar. 2023); *see also*
R. 238–40, 247, 657, 1682, 1796, 1826. He can do these activities for "[a]bout two hours" before
he needs to take a break. R. 50. "[I]t takes [him] three or four times as long to accomplish
anything. A day's worth of work will take [him] close to a week to do because" he has to stop,

rest, and "get restarted, which takes additional time." R. 51; *see also* R. 239, 242, 248, 1969–72. Thomas "used to be able to work on cars as a hobby." R. 59; *accord* R. 241, 584. "[I]t takes [him] a really long time to do any of it now." R. 59.

Thomas also has trouble concentrating, staying on task, and remembering things. R. 58; *accord* R. 239–40, 242, 249–51, 682–83, 712, 840, 844, 1826, 1961, 1969. "It's pretty difficult" to focus on activities because he "can get off task real easy." R. 58. His wife, Ashley, hangs to-do lists on the refrigerator so he can keep track of what he is supposed to do around the house. *Id.* She helped Thomas do most activities of daily living throughout the relevant time. R. 238–40, 242, 248 (Feb. 2021); *accord* R. 683, 693, 840, 844, 1404, 1826, 1932.

A vocational expert ("VE") also testified at this hearing. R. 60–72. As most relevant here, the VE testified that there would be thousands of "unskilled" jobs available in the national economy for a person matching Thomas's vocational profile if that person could "understand, remember, and carry out simple, routine, and repetitive tasks for two hours at a time with normal breaks," meaning a "10 to 15-minute break after the first two hours," then "about a 30-minute lunch break" after the next two hours, then "another 10 to 15-minute break" two hours later; could "concentrate, persist, and maintain pace to complete tasks that do not require assembly line work"; could "have no more than occasional contact with coworkers and supervisor and no contact with the public," where "occasional" means occurring "up to one-third of an eight hour-day"; and could "adapt to occasional changes." *See* R. 62–64, 66. However, no jobs would be available if this same person "would miss work, leave early, or arrive late two days per month." R. 64. Nor would there be any work if the person could attend work on a regular basis, but either needed instructions "repeated and/or redemonstrated occasionally" or "would be off task 15% of the day." *Id.*; *see also* R. 70 ("If those disruptions would cause the individual to be off task for

15% or more of the time or other coworkers to be off task for 15% or more of the time, that
would exclude all occupations.").

\*

ALJ BaileySmith issued an unfavorable decision on April 18, 2023. R. 17–32. At step
one, she found that Thomas had not worked during the relevant "period from his alleged onset
date of September 30, 2016 through his date last insured of December 31, 2021."[2] R. 19. Thomas
had the following "severe" MDIs through his DLI: degenerative disc disease of the cervical and
lumbar spine, status-post anterior cervical discectomy and fusion and lumbar fusion; tendinosis
and arthritis in the right shoulder; migraine headaches; obesity; TBI; generalized anxiety
disorder; and PTSD. R. 19–20. "These impairments were severe because they more than
minimally affected [his] ability to perform basic work activities." R. 20; *see* R. 22–23, 25–30; 20
C.F.R. § 404.1522(b)(1)–(6). Thomas had also been diagnosed with "plantar fasciitis and pes
planus" in both feet. R. 20 (citing R. 510–19, 813–14, 1534–35, 1793–94, 2118–23). ALJ
BaileySmith found that these "foot impairments" were "not severe" MDIs because the evidence
did "not suggest" that they "impose[d] a more than minimal restriction on [Thomas's] ability to
perform work-related tasks." *Id.* (citing R. 510–19, 813–14, 1534–35, 1785, 1793–94, 2118–23);
*see* 20 C.F.R. § 404.1522(a). She did not find "neuropathy" to be a separate MDI affecting his
feet, Pl.'s Br. 12–13. *See* R. 19–20, 24–26; Def.'s Br. 14 ("The note the ALJ referred to
specifically mention[s] neuropathy and limited range of motion as some of the related symptoms
of Plaintiff's foot problems." (citing R. 1534–35)).

---

[2] To qualify for DIB, Thomas must prove that he became "disabled" on or before his date last insured
("DLI"). *Johnson*, 434 F.3d at 655–56; 20 C.F.R. §§ 404.101(a), 404.131(b).

At step three, ALJ BaileySmith concluded that Thomas's severe physical MDIs did not

meet or medically equal Listings 1.15, 1.18, or 11.02, and that his severe neurocognitive and

mental MDIs did not cause a marked or extreme limitation in any of the "paragraph B" areas of

mental functioning in Listings 12.02, 12.06, or 12.15.[3] *See* R. 21–23 (citing 20 C.F.R. pt. 404,

subpt. P, app. 1 §§ 1.15, 1.18, 11.02, 12.02, 12.06, 12.15). As part of the latter conclusion, she

found that Thomas's TBI, anxiety, and PTSD caused a "moderate" limitation understanding,

remembering, or applying information; a "moderate" limitation interacting with others; a

"moderate" limitation concentrating, persisting, or maintaining pace; and a "moderate" limitation

adapting or managing himself.[4] R. 22–23; *see generally* 20 C.F.R. pt. 404, subpt P, app. 1 §

12.00(E)–(F). She based these ratings primarily on Thomas's own statements—both to the

agency and to his medical providers—describing how his allegedly disabling MDIs impacted his

abilities to remember and understand things; to get along with others; to pay attention and stay

---

[3] ALJs use a "special technique" to evaluate mental impairments and neurological disorders not resulting in physical limitations. 20 C.F.R. § 404.1520a; *see* 20 C.F.R. pt. 404 subpt. P, app. 1 § 12.00(B)(1)–(11). At step two/three, the ALJ must "rate the degree" to which the claimant's relevant MDI, or combination of MDIs, "interferes with [his or her] ability to function independently, appropriately, effectively, and on a sustained basis" in each of "four broad functional areas: . . . Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. § 404.1520a(c)(2)–(3); *see Karen Ann G. v. Saul*, No. 19-972, 2020 WL 5369112, at *4 (D. Md. Sept. 8, 2020). The ALJ must rate the claimant's overall degree of limitation in each "paragraph B" area using a standard five-point scale: none, mild, moderate, marked, or extreme. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2). The claimant is entitled to disability benefits at step three if the record establishes that his or her severe MDI(s) causes "marked" limitations in two paragraph B areas, or an "extreme" limitation in one area. *Id.* § 12.00(A)(2)(b). A "marked" limitation means that the person's "functioning in th[e] area independently, effectively, and on a sustained basis is seriously limited," whereas an "extreme" limitation means that the person is "not able to function" on such basis. *Id.* § 12.00(F)(2)(d)–(e). The ALJ's paragraph B ratings may also play an important role in the mental RFC finding before step four, which is a more "holistic and fact-specific evaluation" of the claimant's maximum remaining ability to perform specific work-related activities in an ordinary workplace setting on a regular and continuing basis. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017).

[4] A "moderate" limitation means that the claimant's "functioning in th[e] area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2)(c). It represents a degree of functional limitation that is greater than "mild" or "slightly limited," but less than "marked" or "seriously limited." *See id.* § 12.00(F)(2)(b)–(d).

on task; and to regulate his emotions and behavior. R. 22–23 (citing Testimony; Exs. 5E, 9F,

12F, 14F–16F, 18F); *see* R. 24–27 (citations omitted).

The ALJ's discussion of Thomas's statements implies that he described additional and/or

more extreme limitations in statements to the agency for purposes of proving his DIB claim than

he did in "statements to providers for treatment purposes," R. 27. *See* R. 22. Specifically, while

Thomas "consistently told th[e] agency that he struggled to complete most daily tasks, he told

providers that he was able to work on cars, sail, travel, and take care of a rental property." R. 22.

(citing Testimony; Exs. 3E, 5E, 9F, 12F, 14F–16F, 18F); *see* R. 24–25, 27, 29–30 (discussing

activities of daily living). Thomas could also "shop," "play video games," "spend time with

family," R. 22, "take care of his 13 animals," R. 29, and "complet[e] home projects," R. 30. The

ALJ concluded that "[t]hese activities all required him to learn, recall, and use information," "to

demonstrate appropriate social skills," and "to maintain some degree of concentration, persist at

tasks, and complete those tasks in a timely fashion." R. 22. She also found that, although Thomas

"complained consistently of problems with memory and understanding," feeling "uncomfortable

around others," difficulty "sustaining attention and concentration for prolonged periods," and

"trouble regulating his emotions," his "providers routinely failed to describe any abnormalities"

in his memory, understanding, interpersonal interaction, grooming, hygiene, or stress reactions

on exams. R. 22 (citing Exs. 9F, 12F, 14F–16F, 18F). Some "clinicians noted that he was

distractible at times." R. 22; *see* R. 26 (citing R. 764, 830, 833, 844). Otherwise, they "did not

observe deficits in his cognitive functioning, and he interacted well during appointments." R. 27

(citing Exs. 9F, 12F, 14F–16F, 18F). Thus, the ALJ concluded that Thomas had a "moderate"

limitation functioning independently, appropriately, effectively, and on a sustained basis in all

four broad areas of mental functioning. *See* R. 22–23; 20 C.F.R. § 404.1520a(c)(2)–(3).

ALJ BaileySmith then evaluated Thomas's residual functional capacity ("RFC")[5] during

the relevant time. *See* R. 23–30. She found that Thomas could have performed "light work" as

defined in 20 C.F.R. § 404.1567(b)[6] except:

> he could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and
> stairs. He could not climb ladders, ropes, or scaffolds. He could not work at heights
> or with hazards. He could occasionally reach overhead with the right upper
> extremity, and he could frequently handle and finger bilaterally. He could have no
> more than occasional exposure to extreme cold or vibration, and he could not work
> in extreme heat or direct sunlight. He could work in an environment involving a
> moderate noise intensity or quieter, as defined by the Selected Characteristics of
> Occupations. He could understand, remember, and carry out simple, routine,
> repetitive tasks for two hours at a time with normal breaks, defined as a ten to 15-
> minute break after the first hour [sic], a 30-minute lunch break after the next two
> hours, and a ten to 15-minute break after the next two hours. He could concentrate,
> persist, and maintain pace to complete tasks that do not require assembly line work.
> He could have occasional contact with coworkers and supervisors, but no contact
> with the public. He could adapt to occasional changes.

R. 23; *accord* R. 28–30 (citing Testimony; Exs. 2A, 3A, 5E, 1F, 4F–5F, 7F, 9F, 12F–16F, 18F).

The ALJ concluded that "the above [RFC] assessment is supported by the testimony received at

---

[5] A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an
ordinary work setting" for eight hours a day, five days a week despite the combined limiting effects of all
his or her MDIs and related symptoms or treatment. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996)
(emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the
case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), including objective
clinical findings, medical opinions, and the claimant's own statements, 20 C.F.R. § 404.1545. *See* SSR
96-8p, 1996 WL 374184, at *5.

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "'Frequent' . . . lifting or carrying requires
being on one's feet up to two-thirds of a workday." SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983)
(Jan. 1, 1983). Thus, "the full range of light work requires standing or walking, off and on, for a total of
approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining
time." *Id.* "If someone can do light work, [the ALJ will] determine that he or she can also do sedentary
work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long
periods of time." 20 C.F.R. § 404.1567(b). "Sedentary work involves lifting no more than 10 pounds at a
time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." *Id.* §
404.1567(a). For sedentary jobs, "periods of standing or walking should generally total no more than
about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour
workday." SSR 83-10, 1983 WL 31251, at *5. ALJ BaileySmith found that Thomas could meet all these
exertional demands before his DLI. *See* R. 23, 28–29 (citing R. 82–84, 94–96 (Exs. 2A, 3A)).

the hearing, as well as the evidence in the record." R. 30. She stated that she considered

Thomas's "degenerative disc disease, right shoulder impairments, migraine headaches, obesity,

history of traumatic brain injury, generalized anxiety disorder, and PTSD" and identified the

above functional "limitations consistent with the evidence as discussed" earlier in her decision.

*Id.*; *see generally* R. 24–30.

The ALJ's impairment-by-impairment summary of the medical record, *see* R. 25–26

(citations omitted), shows how she determined the functionally limiting effects of certain MDIs

in assessing Thomas's RFC. *See* R. 25–26, 28–30. For example, she concluded that Thomas's

severe migraine "headaches limited his ability to work around noise, extreme heat, and direct

sunlight." R. 26; *see* R. 24 (citing Testimony); R. 28–29 (citing R. 84, 96). Despite appearing to

credit his ongoing "complain[ts] of persistent headaches that occurred twice a week" and/or

"having one to two headaches a month that affected his functioning," R. 26 (citing R. 551, 613–

15, 637–38, 675–76, 706–07, 710–13, 837–39, 845–47, 1480–82, 1686–87, 1791–92), however,

the ALJ implicitly found that Thomas did not need to "miss work, leave early, or arrive late two

days per month" for any reason, R. 64. *See* R. 27, 29–30. She rejected Dr. Thaler's medical

opinion that Thomas "could work three to four hours per day[] and would require frequent sick

days because of his headaches." R. 29 (citing R. 847). The ALJ concluded these work-preclusive

limitations were "not consistent with the evidence, which establishes that [Thomas] remained

capable of performing a variety of work activities on a regular and continuing basis for the

reasons discussed" earlier in her decision.[7] *Id.*; *see* R. 27–29 (citing Testimony; Exs. 2A, 3A, 9F

---

[7] The ALJ further concluded that these limitations were "not consistent with the observations of Dr. Thaler, who did not describe substantial abnormalities in [Thomas's] physical presentation." *Id.* She did not cite any specific part of Dr. Thaler's exam notes, R. 845–47 (Dec. 2016), to support this conclusion. *See* R. 29. Moreover, contrary to the Commissioner's assertion, the ALJ plainly did not "articulate" whether (and if so, how), she considered the "supportability" factor, 20 C.F.R. § 404.1520c(b)(2), in concluding that Dr. Thaler's medical opinion was "not . . . persuasive," R. 29. *See* Def.'s Br. 17–18. The

12F, 14–16F, 18F); Def.'s Br. 17–18 (citing R. 27–29). She further concluded that Thomas's purported abilities "to attend appointments without an unreasonable number of absences, take care of his 13 animals, travel, work on cars, and take care of a rental property he owned," R. 29 (citing Exs. 9F, 12F, 16F), taken together, "suggests that he could adhere to a schedule and attend work without an unreasonable number of absences," *id. See* Def.'s Br. 16–18.

The ALJ found that Thomas's severe "history of traumatic brain injury with ongoing cognitive complaints, generalized anxiety disorder, and PTSD, taken "together, . . . prevented him from performing complex, fast-paced work activities, and further affected his abilities to interact with others and adapt to changes." R. 26 (citing R. 534–38, 552–55, 583–95, 657–59, 682–90, 759–61, 764–65, 768–74, 797, 803–08, 815, 818, 820, 830–33, 840–42, 844–45, 848–50, 855–57, 1235–38, 1242–46, 1251–54, 1358–61, 1542–45, 1627, 1647–50, 1681–82, 1794–99, 1824–28); *see* R. 24–25 (citing Testimony; R. 237–53); R. 29–30 (citing R. 86, 98). Yet, those MDIs did not prevent him from doing "simple, routine, repetitive tasks for two hours at a time with normal breaks, provided those tasks did not require assembly line work." R. 29; *see* R. 23. The ALJ's RFC determination for unskilled work implicitly concludes that Thomas could remember and follow simple instructions, "remain on task," "work at an appropriate pace," R.

---

medical records indicate that Dr. Thaler's workplace-attendance limitations were based on Thomas's statement to another examining physician in March 2016 that his migraines were so frequent and severe that "he left 3–4 hours early from work on an average of 3 to 4 days a week in the past 12 months," R. 959. *See* R. 847. When Dr. Thaler "reevaluated" Thomas's "service connected [headache] condition" for the VA's disability rating board in December 2016, Thomas reported that his "migraines remain[ed] the same" since the initial evaluation. *See* R. 845–47. The VA subsequently awarded Thomas disability retirement benefits based on a 100% service-connected disability rating. *See* R. 621, 869, 1062, 1614. His migraines (50%) and traumatic brain disease (70%) are service-connected disabilities. R. 1614. The ALJ appears to have overlooked all of this evidence when evaluating Thomas's DIB claim, R. 24–30. *See Rogers v. Kijakazi*, 62 F.4th 872, 878 (4th Cir. 2023) (concluding that the applicable regulation requires an ALJ "to consider any evidence underlying the VA's disability determination that Rogers submitted in support of her SSA claim" (citing 20 C.F.R. § 404.1504)).

29, and "complete [simple] tasks in a timely fashion," R. 22, for eight hours a day, five days a

week. *See* R. 29–31.

The ALJ also discussed Thomas's allegations that he was disabled by constant neck/back

pain; frequent and severe migraine headaches; trouble paying attention, remembering things, and

staying on task; anxiety, panic attacks, and irritability; and social avoidance. R. 24–25 (citing R.

46–59, 237–53). She found that Thomas's severe MDIs "could reasonably be expected to cause

the alleged symptoms; however [his] statements concerning the intensity, persistence[,] and

limiting effects of these symptoms [were] not entirely consistent with the medical evidence and

other evidence in the record for the reasons explained in [her] decision." R. 25; *see* R. 26–27;

Def.'s Br. 12 (citing R. 27).

The ALJ explained that Thomas's migraine and neck/back "pain was not as severe or as

limiting as he claims" because: (1) objective findings on exams were generally unremarkable

except for "tenderness and a limited range of motion in the cervical and lumbar region," and

"clinicians did not . . . note that he appeared sensitive to light or sound, or indicate that he was

uncomfortable sitting or standing during appointments"; (2) Thomas "told the agency that he

could complete few daily tasks independently and that he had headaches weekly, but he did not

complain to providers of frequent headaches or difficulty managing his own daily activities"[8];

(3) the treatment he received for his neck/back pain status-post cervical/lumbar spinal fusions

---

[8] The ALJ also found that Thomas "took medications for his headaches, but did not meet with his
neurologist for approximately 18 months." R. 27; *see* R. 26 (citing R. 613–15, 1625). Contrary to the
Commissioner's suggestion, however, the ALJ did not cite this potential gap in treatment as a specific
reason why Thomas's allegedly disabling migraine "pain was not as severe or as limiting as he claims,"
R. 27. *See* Def.'s Br. 12 (citing R. 27); *Patterson v. Bowen*, 839 F.2d 221, 225 n.1. (4th Cir. 1988) ("We
must . . . affirm the ALJ's decision only upon the reasons he gave."); *cf. Bates v. Berryhill*, 726 F. App'x
959, 960 (4th Cir. 2018) (per curiam) ("The agency seeks to avoid remand by offering several
justifications for the ALJ's Step Three finding, but the ALJ's written decision contains none of those
justifications." (citing *Patterson*, 839 F.3d at 225 n.1)).

was "quite conservative, consisting mainly of oral medications and spinal injections," and "no

provider recommended that he pursue more aggressive treatment to help manage his symptoms";

and (4) Thomas "admitted [his] ability to perform a variety of daily activities." R. 26–27 (citing

Exs. 1F, 4F–5F, 7F, 9F, 13F, 15F–16F, 18F); *see* Def.'s Br. 12 (citing R. 27). The ALJ also

concluded that Thomas's "mental impairments were not as problematic as he alleges" because

(1) objective findings on "mental status exams revealed little more than disturbances in his mood

and affect" with infrequent distractibility and "rare" incongruent laughter or word-finding

difficulty; (2) Thomas "received only conservative care for his mental impairments, but he told

providers that with this [care], his symptoms were well controlled"; and (3) he reported that "he

was able to travel, sail, do household projects, visit with family and work on cars." R. 27 (citing

Exs. 9F, 12F, 14F–16F, 18F).

   The ALJ referenced Thomas's ability to do certain "daily activities" multiple times in her

decision. *See* R. 22, 27, 29–30. According to the ALJ's summary, Thomas testified that "[d]uring

the day, he took care of his animals, did art projects, and did some chores around the house, but

he needed to take a break every two or three hours, so tasks took longer to complete." R. 24

(citing R. 50). *But see* R. 50 ("Well, I try to go out and feed the animals in the mornings. And

then I try and work on an art project or you know cleaning or something."); R. 238 (Thomas

stating that he "takes care" of his family's animals by "mak[ing] sure they have water," letting

them outside, and "petting" them); R. 239 (Thomas stating that he can put away his laundry "if

it's already folded" and that he "tr[ies] to help" with other chores and "household repairs" when

he can, but "it may only be every other week"); R. 242 (Thomas stating that he does "not often"

finish something he starts or he "eventually will finish [it] even if days later"); R. 247 (Ashely

stating that she and their "kids help feed the animals . . . bathe them [and] groom them"); R. 251

15

(Ashely stating that Thomas did not complete tasks). Thomas also "enjoyed watching television, playing videogames and brain games, reading, and working on a car with his son. He visited with his neighbors, and talked to friends and family regularly." R. 24–25 (citing R. 241). She omitted Thomas's qualifying statements that he read about once a month, only "occasionally" "helped [his] son work on cars," visited with neighbors on a "monthly" basis, only "occasionally" chatted with friends and family on Facebook, and talked to family on a "weekly" basis. R. 241. She found that Thomas was able to "shop," R. 22, but later acknowledged that he merely "went to the grocery store with his wife," R. 24 (citing R. 240, 249). She omitted that Thomas "occasionally" accompanied Ashely to the grocery store and that he stayed in the car while she shopped for 20 or 30 minutes. R. 249.

The ALJ also stated Thomas told his medical providers during the relevant time that "he was working on a house," R. 803 (Aug. 2017); that "he had been doing yoga and taking care of a rental property he owned," R. 764 (Nov. 2017); that "he worked on projects around the house, worked on cars, and played games with his family," R. 584 (Feb. 2020); that he "was taking a train to Mississippi to visit his father alone, and he had sailed from Connecticut to Virginia with his father," R. 535 (Jan. 2021); that he was "enjoying his trip [to Mississippi] visiting with his family," R. 1235–36 (Feb. 2021); and that "he took care of his family's 13 animals," R. 1682 (May 2021). R. 27 (citing R. 535, 584, 764, 803, 1235–36, 1682). She found that "sailing" would have "required [Thomas] to have good use of his upper extremities" and "to attain a variety of postures," R. 28, but the only treatment note that she cited to support this finding contains no such information. R. 535 ("[S]tates he went with father sailing boat from [C]onnecticut to VA and enjoyed the trip."). She omitted other evidence showing that Thomas and Ashely were "working on [the house] project together" and "he became [very] irritated and angry . . . when it

16

started not going well," R. 789 (Sept. 2017); that Thomas only "briefly attended" the yoga class,

R. 683 (Dec. 2018), which was held once a week starting in October 2017, *see* R. 764, 797; that

taking care of the rental property was "hard" and caused "many stressors" for Thomas because

Ashley was not there to help him, R. 764, 803; and that Thomas's father went "everywhere" with

him while he was visiting Mississippi, R. 1236 ("[G]oes everywhere with father and feel[s]

comfortable due to that."). The ALJ's finding that Thomas "*stated* that he took care of his

family's 13 animals," R. 27 (emphasis added), relies on a progress note from one telehealth

appointment during which Thomas "talk[ed] fondly" about his family's "13 animals total dogs,

cats, goats, pigs," R. 1682. Thomas often spoke "fondly" of the "stable supportive living"

environment that he shared with Ashley, their two teenagers, and a dozen or so dogs, cats, and

small livestock animals. R. 1693, 1796, 1875. In June 2019, Ashley said their animals "mostly

serve as 'therapy for him.'" R. 675. The ALJ did not cite any part of the record where Thomas

"stated that he took care of his family's 13 animals," R. 27.

Based on her discussion of the evidence, the ALJ found that Thomas "admitted [his]

ability to perform" these specific "daily activities": taking care of 13 animals; sailing; taking a

yoga class; visiting with family; traveling independently; playing video games and board games;

working on cars; working on a rental home; completing home projects; and "attend[ing]

appointments without an unreasonable number of absences." *See* R. 27–30. She concluded that

playing games, traveling, sailing, shopping, working on cars, and taking care of a rental property

"all required [Thomas] to remain on task, . . . work at an appropriate pace," R. 29, "persist at

tasks, and *complete those tasks* in a timely fashion," R. 22 (emphasis added). His purported

abilities "to attend appointments without an unreasonable number of absences, take care of his

13 animals, travel, work on cars, and take care of a rental property he owned," taken together,

17

"suggest[ed] that he could adhere to a schedule and attend work without an unreasonable number of absences." R. 29 (citing Exs. 9F, 12F, 16F).

At step four, ALJ BaileySmith found that this RFC ruled out Thomas returning to his past occupation as a deck officer on a ship, which was skilled work performed at light-to-very heavy exertional levels. R. 30 (citing R. 61–62, 221–22, 230). Relying on the VE's testimony, however, ALJ BaileySmith found that Thomas's RFC and vocational profile as of December 31, 2021, *see* R. 23, 30, allowed him to work full-time in various "unskilled"[9] sedentary occupations (final assembler, inspector, bonder-machine tender) and light occupations (machine feeder, mail sorter, housekeeping cleaner) existing in the national economy. R. 31 (citing R. 62–64); *see* R. 62–72. Accordingly, the ALJ concluded that Thomas was not disabled from September 30, 2016, through December 31, 2021. R. 31–32. The Appeals Council declined to review that decision, R. 1–5, and this appeal followed.

## III. Discussion

To qualify for DIB, Thomas needed to prove he had a severe MDI(s) that prevented him from working eight hours a day, five days a week in an ordinary workplace environment for any twelve continuous months between September 30, 2016, and December 31, 2021. R. 17–18, 23–30; *see Barnhart v. Walton*, 535 U.S. 212, 217–19 (2002); *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340–42 (4th Cir. 2012). ALJ BaileySmith was required to consider all the relevant

---

[9] "'Unskilled work' is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart*, 181 F. App'x 359, 364 n.3 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a)). "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985). ALJ BaileySmith found that Thomas could "perform simple, routine, repetitive tasks . . . provided those tasks did not require assembly line work," "tolerate occasional contact with coworkers and supervisors," and "adapt to occasional changes" in an ordinary workplace setting. *See* R. 29–30.

evidence in Thomas's record, including any evidence created after December 2021 that offered some insight into Thomas's medical conditions and related activities or functional limitations as they existed before his DLI. *See Bird*, 699 F.3d at 341–42. Because Thomas filed for DIB after March 26, 2017, however, "the ALJ was not required to consider—much less discuss or accord any weight to—the VA's [100%] disability determination." *Rogers*, 62 F.4th at 878 (citing 20 C.F.R. § 404.1504, 404.1520b(c)(1)). "Rather, the ALJ merely had to consider any evidence underlying the VA's disability determination that [Thomas] submitted in support of [his DIB] claim" along with all the other relevant evidence in his record. *Id.* (citing 20 C.F.R. § 404.1504). I must accept the ALJ's findings and conclusions if her decision shows that she "examined all relevant evidence and offered a sufficient rationale in crediting certain evidence and discrediting other evidence." *Shelly C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 353 (4th Cir. 2023).

*

Thomas challenges ALJ BaileySmith's denial of disability benefits on three grounds. *See generally* Pl.'s Br. 9–12, 15–16 (symptoms analysis), 12–13 (non-severe foot impairments), 13–15 (Dr. Thaler's medical opinion and daily activities). His objections to the ALJ's analysis of his symptoms and Dr. Thaler's medical opinion—both of which relied on her flawed conclusion that Thomas had "admitted [his] ability" to do specific "daily activities" referenced throughout her decision, R. 24, 26–27, 29–30—are persuasive and require reversal under binding Fourth Circuit precedent.[10] *Oakes v. Kijakazi*, 70 F.4th 207, 216–17 (4th Cir. 2023); *Arakas v. Comm'r of Soc. Sec.*, 983 F.3d 83, 99–101 (4th Cir. 2020).

---

[10] Accordingly, I do not address Thomas's other arguments. *See* Pl.'s Br. 12–13. I note, however, that the ALJ appears to have overlooked significant medical-source evidence contrary to her conclusion that the treatment Thomas received for his chronic neck and back pain status-post cervical and lumbar fusion surgeries "was quite conservative, consisting mainly of oral medications and spinal injections," as well as to her conclusory finding that "no provider recommended that he pursue more aggressive measures to help manage his symptoms," R. 27. *Contra* R. 407–11, 427, 438, 466–70, 1623. Thomas had two spinal

\*

A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite the combined limiting effects of all his or her MDIs and related symptoms[11] or treatment. SSR 96-

---

fusion surgeries in 2014–2015. R. 46, 453–56. After his alleged onset date, he saw a pain-management specialist who administered bilateral cervical/lumbar epidural steroid injections, R. 434, 455, and medial branch blocks, R. 413, 424, 426, 476–80. Thomas had already "tried and failed conservative treatments such as bed rest, back supports, [p]hysiotherapy, . . . pharmacotherapies (e.g., anti-inflammatory agents, analgesics and muscle relaxants)," R. 409, cortisone injections, "activity modification, and bracing," R. 453, 499. In late 2017, the pain-management specialist offered Thomas medial branch blocks because he did "not see more significant or sustained improvement following" an epidural steroid injection, *see* R. 438. His "positive response" to that procedure favored "proposed radiofrequency ablation" with bilateral thermal denervation, R. 409. *See* R. 407, 466–70. By April 2021, Thomas "had been through several radiofrequency ablation procedures with benefit." R. 1632. The ALJ did not mention that Thomas underwent radiofrequency ablations on top of the epidural steroid injections and medial branch blocks, R. 24–27. *See* Pl.'s Br. 15–16 (citing *Lewis*, 858 F.3d at 869).

In *Lewis*, the Fourth Circuit explained that an ALJ contravened 20 C.F.R. § 404.1529 by characterizing the claimant's "extensive treatment"—which included one epidural injection, two nerve blocks, and one radiofrequency ablation—as a "conservative" course of treatment for allegedly disabling back pain. *Lewis*, 858 F.3d at 869. Moreover, ALJ BaileySmith's conclusion that medications and "spinal injections" was a "quite conservative" course of treatment for Thomas's neck/back pain, R. 27, conflicts with the physician's assessment that bilateral cervical/lumbar epidural steroid injections, medical branch blocks, and radiofrequency ablations were medically appropriate to treat his neck/back pain because Thomas had "tried and failed conservative treatments" to manage those symptoms, R. 409; *see* R. 453, 499. The ALJ did not mention this evidence. *See* R. 25–29. "The ALJ is beholden to the medical evidence in the record." *Easterbrook v. Kijakazi*, 88 F.4th 502, 515 (4th Cir. 2023). On this record, she could not rely on her own perception that Thomas received "conservative care," R. 27, to discount his complaints of disabling pain. *Cf. Easterbrook*, 88 F.4th at 515 (explaining that "the ALJ is beholden to the medical evidence in the record and cannot" discount a treating physician's medical opinion "based on [the ALJ's] perceived omissions in care" where there is no indication that the physician thought additional measures were "medically necessary or prudent to resolve" the claimant's symptoms).

---

[11] "Symptoms means your own description of your physical or mental impairment." 20 C.F.R. § 404.1502(i). "[S]tatements about your pain or other symptoms will not alone establish that you are disabled. There must be objective evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence . . . , would lead to a conclusion that you are disabled." *Id.* § 404.1529(a). Once the claimant meets this threshold burden, however, he or she is "entitled to rely entirely on subjective evidence to prove" that a symptom "is so continuous and/or so severe that it prevents him [or her] from working a full eight hour day." *Hines*, 453 F.3d at 565; *see* 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain and other symptoms or about the effect your symptoms have on your ability to work *solely* because the available objective medical evidence does not substantiate your statements." (emphasis added)).

8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by
the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller*, 459 F. App'x at
230–31, including objective clinical findings, medical opinions, and the claimant's own
statements, 20 C.F.R. § 404.1545. *See* SSR 96-8p, 1996 WL 374184, at *5. Generally, a
reviewing court will affirm the RFC determination when the ALJ considered all the relevant
evidence under the correct legal standards, *Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251,
268–72 (4th Cir. 2017), and the ALJ's decision builds "an accurate and logical bridge from that
evidence to his [or her] conclusion," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018)
(cleaned up), *superseded on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th
Cir. 2023). *See, e.g.*, *Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020). Here, the primary
issues are whether the ALJ actually considered all the relevant evidence in Thomas's record and,
if so, whether her written decision builds an "accurate and logical bridge" from this evidence to
her conclusions that Thomas could "persist through an eight-hour work day" for five days a
week, *see Brown*, 873 F.3d at 269–71.

ALJ BaileySmith's RFC assessment does not satisfy "this highly deferential standard of
review," *Turner v. Comm'r of Soc. Sec.*, No. 23-1760, 2024 WL 2764722, at *4 (4th Cir. May
30, 2024) (citing *Shelley C.*, 61 F.4th at 353). To start, she did not cite *any* evidence to support
her finding that Thomas "was able to attend appointments without an unreasonable number of
absences," R. 29. *See, e.g.*, *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) ("[SSR 96-8p]
explains that the [RFC] 'assessment must include a narrative discussion describing how the
evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and
nonmedical evidence (e.g., daily activities, observations).'" (quoting SSR 96-8p, 1996 WL
374184, at *7)). This finding was one of two reasons—along with Thomas's purported ability to

"take care of his 13 animals, travel, work on cars, and take care of a rental property he owned"—
why the ALJ concluded, contrary to Dr. Thaler's medical opinion, that Thomas "could adhere to
a schedule and attend work without an unreasonable number of absences," *id.* (citing Exs. 9F,
12F, 16F). Her general citation to entire medical exhibits, *see* R. 524–1156 (Ex. 9F); R. 1192–
1363 (12F); R. 1667–1723 (Ex. 16F), is inadequate because it "does not permit me to review the
actual evidence" that the ALJ believed supported this outcome-determinative conclusion, *Turner
v. Comm'r of Soc. Sec.*, Civ. No. SAG-11-260, 2013 WL 210624, at *1 (D. Md. Jan. 17, 2013).
*See, e.g.*, *Woods*, 888 F.3d at 695 ("In other words, the ALJ must *both* identify evidence that
supports his conclusion *and* build an accurate and logical bridge from that evidence to his
conclusion." (cleaned up)).

     Moreover, the cited Exhibits clearly show that many of Thomas's medical appointments
were video/telehealth visits where he was in his own home. *See, e.g.*, R. 534, 547, 562, 576, 657,
659, 682, 691, 855, 989, 1241, 1275, 1627, 1647, 1660, 1681, 1692. Each visit lasted 30 to 60
minutes, *see id.*, meaning that Thomas would have had most of the day to engage in activities at
his own pace and as his allegedly disabling neck/back pain, migraines, and TBI/PTSD symptoms
allowed, *see, e.g.*, R. 46–50, 52–59, 237–43, 246–53, 535, 583–84, 657, 659, 682–83, 693, 710,
808, 844, 957, 959, 1236, 1286, 1404, 1482, 1682, 1796, 1826. Thus, the cited Exhibits do not
logically support the ALJ's conclusion that Thomas "could adhere" to a normal 40-hour work
"schedule and attend work without an unreasonable number of absences," R. 29. *Cf. Williams v.
Comm'r of Soc. Sec. Admin.*, No. 8:22cv129, 2022 WL 17084404, at *13 (D.S.C. Nov. 3, 2022)
("[S]everal of the treatment notes the ALJ relies on are from telehealth visits where the provider
and Plaintiff spoke over the phone and the provider was not able to observe Plaintiff's demeanor
or behavior."), *adopted*, 2022 WL 17084071 (D.S.C. Nov. 18, 2022).

Moreover, Ashely frequently attended Thomas's in-person medical appointments, *see, e.g.*, R. 535, 551, 582, 609, 611, 613, 621, 641, 657, 682, 788, 841, 1623, 1635, because Thomas did not drive alone, R. 240, and he needed help "talk[ing] to doctors [and] remember[ing] what to get/say," R. 241. Nonetheless, Thomas still failed to appear at multiple medical appointments during the relevant time. *See, e.g.*, R. 608, 626, 663, 755–57, 764, 788, 1543, 1650, 1677. In November 2017, his PTSD counselor opined that he had "a hx [history] of missing appointments due to migraines." R. 764. In January 2018, he was discharged from PTSD group counseling because he "missed two consecutive" weekly sessions. R. 755. This was around the same time that he reported having at least two debilitating migraines per week. *See, e.g.*, R. 710–13, 1480–82 (July & Aug. 2018). In February 2021, Thomas told the agency that he "talked" to his doctors "weekly." R. 241. He did not "go [anywhere] on a regular basis." *Id.*

The ALJ did not reference any of this evidence in her decision. *See* R. 21–30; *cf. Lewis*, 858 F.3d at 869 ("An ALJ has an obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding."). At the very least, it conflicts with the ALJ's conclusory finding that Thomas "was able to attend appointments without an unreasonable number of absences," R. 29. *Cf. Hines*, 453 F.3d at 566 ("The deference accorded to an ALJ's findings does not mean that we credit even those findings contradicted by undisputed evidence."). It also undermines her conclusion that Dr. Thaler's medical opinion limiting Thomas "to 3–4 hours" of work per day and allowing him "frequent sick days due to recurrent migraine," R. 847, was "not consistent with *the evidence*, which suggests [Thomas] could adhere to a schedule and attend work without an unreasonable number of absences," R. 29 (emphasis added). Thomas could be as limited as Dr. Thaler opined and still manage to attend most of his telehealth or in-person doctors' visits as

23

scheduled. *Cf. Hines*, 453 F.3d at 565 ("This conclusion was not supported by substantial

evidence because the record, when read as a whole, reveals no inconsistency between the two.").

Second, the ALJ improperly evaluated Thomas's statements describing the intensity,

persistence, and functionally limiting effects of his allegedly disabling neck/back pain, migraine

headaches, cognitive deficits, and PTSD symptoms. *See* R. 26–27. The ALJ concluded that

Thomas's migraine "pain was not as severe or as limiting as he claims," R. 27, because he

purportedly "did not complain to providers of frequent headaches *or* difficulty managing his own

daily activities," *id.* (emphasis added). This reason—which the ALJ did not cite any evidence to

support—is difficult to reconcile with her earlier conclusion that Thomas "has a long history of

migraine headaches, and despite treatment, he complained of persistent headaches that occurred

twice a week," R. 26 (citations omitted). *Cf. Lataures L. v. Comm'r of Soc. Sec.*, No. 4:18cv67,

2020 WL 2066756, at *4 (W.D. Va. Mar. 27, 2020) (recommending reversal where ALJ "did not

cite any evidence to support" her finding that claimant's mental-status exams reflected "'no more

than mild'" deficits because this finding was "impossible to reconcile with [the ALJ's] later

summary of two consultative examiners' consistently abnormal observations on mental-status

exams"), *adopted*, 2020 WL 2065872 (W.D. Va. Apr. 29, 2020); *Mallett v. Berryhill*, No.

5:18cv241, 2019 WL 2932776, at *4 (E.D.N.C. June 17, 2019) ("An ALJ's opinion that is

internally inconsistent frustrates meaningful review and requires remand."), *adopted*, 2019 WL

2980032 (E.D.N.C. July 8, 2019).

Moreover, Thomas repeatedly told providers about "difficulty managing his own daily

activities," R. 27. In December 2016, he told a couples counselor that Ashely was "his primary

care giver." R. 844. Ashley "trie[d] to remain stoic" during this session, "but [she] finally cried

and opened up about the amount of assistance she gives" Thomas. *Id.* She said that she reminded

Thomas to shower and brush his teeth, helped him dress and undress, managed his medications, drove him places, and handled the family's finances. *Id.*; *accord* R. 238–39, 241, 248, 693. The counselor observed Ashely "appear[ed] to be overwhelmed." R. 844. They were "doing their best to manage [Thomas's] symptoms," but the "level of assistance that he needs ma[de] it difficult for them to really focus on anything else." *Id.* In August 2018, Thomas reported a 36-month history of "worsening migraine which leaves him disabled for almost 12–15 days per month." R. 710. In June 2019, he told his psychiatrist that the "life style [he] maintained is that 'of a hermit.'" R. 657; *accord* R. 241 (Feb. 2021). That October, he reported needing "some/partial" help with "daily care" tasks like dressing and bathing. R. 1404; *accord* R. 238–39, 241, 248 (Feb. 2021). In May 2021, Thomas told his neurologist that he was having "at least one if not 2 headache days a month that make it difficult for him to do things that he would like to do. He state[d] specifically that it makes it hard for him to work." R. 1686. The neurologist opined that Thomas had "still fairly intractable headache." R. 1687. That September, Thomas told his psychiatrist that his migraine "headaches are ongoing [and] disabling for him." R. 1826. He still "need[ed] help with reminders" to keep medical appointments and take his medications as prescribed. *Id.* (spelling corrected). In February 2022, two months after his DLI, Thomas reported that his "severe" headaches and TBI symptoms were "frequently present and disrupt[ed] activities" such that he "can only do things that are fairly simple or take little effort." R. 1961. He "can't finish things," "can't remember things," tires quickly, is "easily annoyed," and has poor frustration tolerance. R. 1961–62. These symptoms "interfere with activities 25–75% of the time." R. 1969. Thomas "[r]equires moderate assistance or supervision from others (25–75% of the time)" to do ordinary self-care tasks and household chores. R. 1969–70. Ashley still

organizes his pills and reminds him to take them, pays the bills, and helps him bathe. *Id.*; *accord*

R. 238–40, 242, 248 (Feb. 2021).

The ALJ concluded that Thomas's reports to the "agency that he could complete few

daily tasks independently" were inconsistent with the ALJ's own finding that "he did not

complain to providers of . . . difficulty managing his own daily activities," R. 27. "The deference

accorded" to an ALJ findings under the substantial-evidence standard does not mean this Court

must "credit even those findings contradicted by undisputed evidence." *Hines*, 453 F.3d at 566.

Here, the undisputed evidence shows that Thomas consistently told the agency and his own

doctors that he needed help completing daily tasks. Accordingly, substantial evidence does not

support the ALJ's conclusion that Thomas's statements to the agency were "not entirely

consistent" with his purported failure to report those same concerns to his own healthcare

providers, R. 26–27. *See Hines*, 453 F.3d at 566.

Third, "the ALJ improperly considered whether [Thomas's] daily activities were

inconsistent with his claim of disability," *Oakes*, 70 F.4th at 216. *See* R. 27, 29–30. "ALJs may

consider daily activities when evaluating symptoms, including pain." *Oakes*, 70 F.4th at 216

(citing 20 C.F.R. § 404.1529(c)(3)(i)). "But an ALJ errs in extrapolating from daily and life

activities that a claimant has increased residual functional capacity, or, in other words, has the

ability to do sustained work-related activities on a regular and continuing basis—i.e., 8 hours a

day, for five days a week, or an equivalent work schedule." *Id.* (internal quotation marks

omitted). This is because the "inability to sustain full-time work due to pain and other symptoms

is often consistent with [the] ability to carry out daily activities." *Arakas*, 983 F.3d at 101. The

"critical differences between activities of daily living and activities in a full-time job are that a

person has more flexibility in scheduling the latter than the former, can get help from other

persons . . . , and is not held to a minimum standard of performance as [he or] she would be by an employer." *Id.* (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)). The Fourth Circuit "also recognizes that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations. Rather, being able to live independently and participate in the everyday activities of life empowers people with disabilities and promotes their equal dignity." *Oakes*, 70 F.4th at 216 (cleaned up). "In pursuing those ends, disability claimants should not have to risk a denial of Social Security benefits." *Id.*

ALJ BaileySmith made several legal errors when evaluating Thomas's daily activities as part of her RFC assessment. *See* R. 24–30. One, she did not cite any evidence to support her conclusions that playing games, traveling independently, taking one sailing trip, shopping, working on cars, or taking care of the rental property actually "required [Thomas] to . . . work at an appropriate pace," R. 29, or to "complete [any] tasks in a timely fashion," R. 22. There is no information in the record about what Thomas did (or did not do) the one time "he went with [his] father sailing boat [sic] from" Connecticut to Virginia. R. 535 (Jan. 2021). The cited progress note simply states that he "enjoyed the trip." *Id.* The same is true of the one occasion when Thomas reported he was "planning a trip" to Mississippi "to visit his father by himself for a few days." *Id.* Thomas said that he went "everywhere with his father" while visiting family in Mississippi and "ha[d] been able to enjoy the trip" with this support. R. 1235–36 (Feb. 2021). Nor did Thomas say what tasks or functions were actually involved in "taking care of [his] rental property" in August and November 2017. *See* R. 27 (citing R. 764, 803). He simply said he that "was busy," R. 803, and "shared the many stressors associated with" this activity, R. 764. Thus, there is no indication that any of these activities "required" Thomas to "work at an appropriate pace," R. 29, or complete work-related "tasks in a timely fashion," R. 29. The ALJ erroneously

relied on those unsupported findings to support her conclusions that Dr. Thaler's opinion and

Thomas's testimony describing work-preclusive limitations were "not consistent with" Thomas's

ability to do these particular kinds of activities. *See* R. 27, 29.

Two, the ALJ improperly considered the *type* of activities that he could perform "without

also considering the *extent* to which he can perform them," *Oakes*, 70 F.4th at 216. She cited

Thomas's abilities to "do household projects," "take care of his 13 animals, travel, work on cars,

and take care of a rental property he owned," R. 27, 29, when explaining why she discounted Dr.

Thaler's medical opinion and Thomas's testimony. As noted, however, her finding that Thomas

"took care of his family's 13 animals," R. 27 (citing R. 1682), was based entirely on a provider's

comment that Thomas "talk[ed] fondly" about those animals, R. 1682. The ALJ omitted other

evidence that Thomas "takes care" of his family's animals by "try[ing] to go out and feed [them]

in the morning," R. 50, "making sure they have water," letting them outside, and "petting" them,

R. 238, whereas Ashely and their teenagers feed, bathe, and groom them, R. 251. She omitted

Thomas's testimony that he only "occasionally" "helped [his] son work on cars," R. 241, and "it

takes him a really long time" to do these projects, R. 59. She acknowledged that Thomas takes a

break every few hours when doing household chores, R. 24 (citing R. 50–51), but omitted

testimony that he can "help" Ashely with chores only when he feels well enough to do so, R.

239, 248. In February 2021, Thomas told the agency that this "may only be every other week."

R. 239. "Substantial evidence does not support the ALJ's conclusion" that Dr. Thaler's opinion

and Thomas's "subjective complaints were inconsistent with [his] daily activities, 'because the

record, when read as a whole, reveals no inconsistency between the two.'" *Arakas*, 983 F.3d at

100 (quoting *Hines*, 453 F.3d at 566). As in *Hines* and *Arakas*, "'[t]he ALJ selectively cited

evidence concerning tasks which [Thomas] was capable of performing' and improperly

disregarded [his] qualifying statements." *Arakas*, 983 F.3d at 100 (quoting *Hines*, 453 F.3d at 566). Her decision does not "demonstrate that she adequately considered them and found them to be inconsistent with specific, [relevant] evidence in the record," *Footman v. Kijakazi*, No. 21-1116, 2023 WL 1793156, at *2 (4th Cir. Feb. 7, 2023) (distinguishing the ALJ's decision in *Arakas*). Thus, the ALJ failed to build an accurate and logical bridge from the evidence to her conclusions that Dr. Thaler's medical opinion and Thomas's testimony were not consistent with Thomas's daily activities. *See Arakas*, 983 F.3d at 100

Finally, the ALJ did not explain how Thomas's limited and infrequent abilities to help take care of his family's animals, travel independently, help his son work on cars, and take care of a rental property showed that he could persist through a normal eight-hour work day five days a week, R. 29–30. *See Arakas*, 983 F.3d at 100–01; *Brown* 873 F.3d at 268–72. She "merely stated in a conclusory manner," *Arakas*, 983 F.3d at 100, that Thomas's abilities to engage in these types of activities "suggest[ed] that he could adhere to a schedule and attend work without an unreasonable number of absences," R. 29. "If [Thomas's] qualifying statements are properly considered, it becomes clear that []he could perform only minimal daily activities that in no way suggested any ability to engage in full-time work on a sustained basis" outside his home. *Arakas*, 983 F.3d at 100. On remand, the ALJ must evaluate Thomas's symptoms based on all the relevant evidence in accordance with 20 C.F.R. § 404.1529.

## IV. Conclusion

For the foregoing reasons, I find that the Acting Commissioner's decision is not supported by substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge reverse and remand the Acting Commissioner's final decision under the fourth sentence of 42 U.S.C. § 405(g), and dismiss the case.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding district judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: March 14, 2025

Joel C. Hoppe
United States Magistrate Judge

30